Argued and submitted March 11, Court of Appeals reversed and remanded to trial court for entry of judgment December 16, 1986, reconsideration denied March 17, 1987

BOLLAM et al,
*Petitioners/Cross-Respondents on Review,*

*v.*

FIREMAN'S FUND INSURANCE COMPANY,
*Respondent/Cross-Petitioner on Review.*

(No. A8004-02314; CA A27608; SC S32432, S32435)

730 P2d 542

Stephen R. Frank, Portland, argued the cause for petitioners/cross-respondents on review. With him on the briefs

were Montgomery W. Cobb and Tooze, Marshall, Shenker, Holloway & Duden, Portland.

Gary V. Abbott, Portland, argued the cause for respondent/cross-petitioner on review. With him on the briefs was Hallmark, Griffith & Keating, P.C., Portland.

Before Lent, Presiding Justice, and Linde, Campbell, Carson and Jones, Justices.

LENT, P. J.

## LENT, P. J.

In an action for damages by insureds against their liability insurer for negligent management of a claim against them, does their cause of action accrue (1) when the insureds are aware that the claim cannot be settled within their policy limits and as a result of the negligence incur attorney fees to protect their own interests, or (2) when they later pay their own funds to the claimant in order to settle the claim?[1] We hold that the cause accrues when they incur attorney fees as a result of the insurer's negligence.

On January 23, 1975, plaintiffs were involved in a motor vehicle collision in which Mr. Ruhle, in the other vehicle, was injured. Defendant was plaintiffs' motor vehicle liability insurer on a policy with applicable $100,000 limits. Plaintiffs' liability to Ruhle was reasonably clear.

About eight days after the collision, defendant began making advance payments to Ruhle of $400 per week in addition to payment for his medical expenses. Defendant continued to make advance payments for a period of about 18 months until July 1976, in a total sum of almost $49,000.

At that time, defendant advised plaintiffs that they should retain their own attorney to evaluate the Ruhle claim. Plaintiffs did so, and it is undisputed that plaintiffs incurred attorney fees thereby.

By April 1977, plaintiffs had been advised by defendant that Ruhle had sustained serious injuries, that advance payments of almost one-half of the policy limits had been made, and that Ruhle would not accept the remainder of the policy limits in settlement of his claim. By June 29, 1977, plaintiffs' attorney was advised that advance payments of $48,830 had been made.

In May 1977, defendant offered to settle Ruhle's claim for the balance of the policy limits. Ruhle's response was to file an action for damages against plaintiffs. When the action had been pending for almost two years, it was settled by defendant paying to Ruhle the balance of its policy limits and

---

[1] The case is presented as being governed by ORS 12.110(1), which requires that the cause be commenced within two years from the time the cause accrued.

plaintiffs paying to Ruhle an additional $35,000. Plaintiffs made this payment about June 29, 1979.

On April 25, 1980, plaintiffs commenced this action for damages, asserting that the cause of their damages was the negligence of defendant in its management of Ruhle's claim.[2] This was more than two years from the time that plaintiffs retained their own attorney and incurred legal fees in connection with the Ruhle claim, but less than two years from the date that Ruhle's claim was settled and plaintiffs paid the $35,000.

In their complaint, plaintiffs alleged that as a result of defendant's negligence they "were required to pay" the $35,000 "to their damages in the sum of $35,000" and that:

> "Plaintiffs were required to retain attorneys to advise them in connection with Ruhle's claim and incurred reasonable and necessary attorney's fees and costs in connection therewith in the sum of $3,270.71, to their further damages."

The prayer of the complaint was for "judgment against defendant in the sum of $38,270.71, in addition to their costs and disbursements incurred herein, including a reasonable attorney's fee [for prosecution of the case at bar]."

In addition to denying negligence, defendant pleaded the affirmative defense that the action was not commenced within the statute of limitations, *i.e.,* two years from the time the cause accrued. By motion for summary judgment, defendant continued to pursue that defense, but the motion was denied. In further support of that defense, during trial defendant made an offer of proof in the form of a stipulation by plaintiffs' counsel that plaintiffs incurred and paid attorney fees in connection with the Ruhle claim prior to April 1978. The evidence was not received because the trial court ruled, as a matter of law, that the cause did not accrue until the payment of the $35,000.

The claim for damages for $35,000 was submitted to the jury, which returned a verdict for that amount. The claim

---

[2] At trial, the only allegation of negligence submitted to the jury was that defendant was negligent in making advance payment when it knew, or in the exercise of reasonable care should have known, that to do so would preclude settlement of Ruhle's claim within plaintiffs' policy limits.

for reasonable and necessary attorney fees incurred by plaintiffs with respect to the Ruhle claim was later reduced by plaintiffs to $3,023.21[3] and thereafter decided by the court to be $2,873.21, *i.e.,* $150 less than the amount of alleged damages. Accordingly, the court eventually entered judgment for $35,000 and "for the additional sum of $2,873.21 on account of plaintiffs' additional damages incurred as attorney's fees."

Under ORS 12.010 and 12.110(1) the two-year period for commencement of an action begins when the cause of action accrues. The task here then is to determine when this cause of action accrued.

■　For recovery in this case, plaintiffs were required to plead and prove that defendant was negligent and that such negligence was the legal cause of harm and resulting damages to plaintiffs. The alleged (and proved) negligence was defendant's conduct in making advance payments when it knew or should have known that to do so would preclude settlement within the policy limits. This conduct had ended in July 1976. At that time, the conduct either did or did not fall below the standard of care that would have been exercised by an ordinarily careful and prudent person in the same or similar circumstances. In other words, negligence, if any, had then occurred.

■　A cause of action for that negligence could not arise, however, until it caused harm and resulting damages to plaintiffs.

> "Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of the plaintiff's case. Nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred. The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered.
>
> "It follows that the statute of limitations is generally held

---

[3] Plaintiffs' counsel informed the court in a post-verdict affidavit that $247.50 of the $3,270.71 damages alleged in the complaint was a mistake, having been incurred for unrelated services.

not to begin to run against a negligence action until some damage has occurred." (Footnotes omitted.)[4]

Prosser & Keaton, The Law of Torts 165 (5th ed 1984).

The affidavit of plaintiffs' counsel, filed after the trial and verdict in support of the claim for damages for attorney fees alleged to have been incurred "in connection with Ruhle's claim," shows that $3,023.21 was thereby incurred and further shows that at least $745.50 of that sum was incurred prior to April 1978.

The only claim of negligence that was submitted to the jury concerns conduct of defendant that ended with the final advance payment, an act that occurred about July 1976. Plaintiffs have pleaded that this negligence caused them loss by way of incurred attorney fees. Their evidence was that prior to April 1978 they had incurred at least $745.50 for those fees. Both by their pleading and their evidence, they have taken the position that defendant's conduct from about the end of January 1975 to July 1976 was negligent, that this negligence caused them loss compensable by way of damages, and that this loss had in part occurred prior to April 1978. They had a cause of action against defendant for those damages sometime prior to April 1978, but this action was not commenced until April 25, 1980, a date more than two years after their cause of action accrued.

Both plaintiffs and defendant have cited to us our decisions in *U.S. Nat'l Bank v. Davies,* 274 Or 663, 548 P2d 966 (1976), and *Jaquith v. Ferris,* 297 Or 783, 687 P2d 1083 (1984). The Court of Appeals split in decision on this case because of different interpretations of the meaning of *Jaquith.*

The Court of Appeals majority held:

"Although, theoretically, plaintiffs' incurrence of attorney fees caused them damage more than two years before the filing of this action, we hold that the Statute of Limitations did not begin to run at least until the date when Ruhle's case against

---

[4] The quoted text seems to use the words "harm" and "damage" synonymously. If the author intends that each term means the existence of loss or detriment in fact resulting from negligence, we agree that the terms are synonymous; however, to use the word "damage" tends to lead to confusing "damage" with "damages," a word properly used to denote a sum of money awarded to compensate the victim of another's negligence. *See* Restatement (Second) of Torts §§ 7, 12A (1965).

plaintiffs was settled and they paid Ruhle the $35,000 excess liability. In our view, this is a case in which practicality and legality meet: the incurrence of attorney fees to guard against the possibility of future harm does not constitute damage sufficient to start the running of the statutory period. Until the Ruhle claim was settled for $35,000 over the policy limits, plaintiffs' exposure to excess liability was merely a possibility. Had the claim been settled within the policy limits, their concern would have vanished. We, therefore, hold that, under these facts, the commencement of the statutory period was delayed until plaintiffs suffered substantial, palpable damage, *i.e.,* excess liability. To hold otherwise would result in an anomolous [sic] situation in which plaintiffs would have been required to have initiated an action in anticipation of a loss that might never have materialized. Such provisional actions were expressly disapproved in *U.S. Nat'l Bank v. Davies, supra,* 274 Or at 670." (Footnote omitted.)

76 Or App at 273.

The Court of Appeals dissenters reached the contrary conclusion.

"This case falls squarely within *Jaquith v. Ferris, supra.* It is distinguishable from *U.S. Nat'l Bank v. Davies, supra,* for the same reason that *Jaquith* was. In *Davies,* the controlling issue was when did the plaintiff become aware, or should have become aware, of the *cause* [emphasis added] of his damage, not when the harm *occurred.* Because the cause of his damage, if any, could not have been determined until the prior action was terminated, the court held that the Statute of Limitations did not commence to run until that determination had been made. Here, as in *Jaquith,* the resolution of the prior action was determinative of the extent of the damages, not the cause."

76 Or App at 280.

We agree with the dissent. Our reasoning is as follows. *Davies* was an attorney malpractice action. There, defendant attorneys had advised a client, plaintiff's decedent, that the client could accept certain corporate trust funds in return for his shares of stock in the corporation. This advice was given in 1967. Subsequently, in August 1971, the corporation sued the client for return of the funds, alleging that such use of the funds was illegal and in violation of the client's fiduciary duty. In May 1973, the action was settled by the client paying $170,000 to the corporation. On November 5,

1974, the client brought an action against the attorneys to recover the $170,000 plus $20,000 in attorney fees incurred defending against the corporation's action. The defendant attorneys asserted that the action had not been filed within the appropriate limitations period, which they claimed ran from the time the client was sued or hired defense counsel. The trial court agreed and dismissed the complaint as untimely.

This court held that on the record before it the limitations period did not run as a matter of law until the action between the client and corporation determined whether the attorneys' advice was incorrect. If the client prevailed on the merits against the corporation, "he would not normally be in a position to claim that negligent advice on the part of [his former attorneys] was a cause of his expense of defense." 274 Or at 668-69.

In *Jaquith* we characterized *Davies* as follows:

"* * * [T]he crux of *Davies* is this: We were unwilling to hold decedent to awareness of his attorneys' malpractice until the litigation precipitated by the attorneys' advice was resolved. The resolution of the issue presented in the first action, the legality of the stock payments, would alert plaintiff to the existence or nonexistence of a malpractice claim. If the stock payments were found legal, plaintiff would have no reason to believe a malpractice claim existed. If the stock payments were found to be illegal, decedent would then be aware that the propriety of his attorneys' advice was open to challenge.[3]

"* * * * *

"[3]It happened in *Davies* that the first action between the corporation and decedent was settled with decedent paying a sum back to the corporation. This meant that the legality of the stock payments, and hence the propriety of the attorneys' advice, had yet to be resolved. Until the action was settled, however, there existed the possibility that the stock payment would be found legal, a determination that would eliminate the possibility of decedent's malpractice claim."

297 Or at 787.

*Jaquith* involved different facts. There, plaintiff seller engaged defendant realtor to appraise and market her

real property in December 1977. The appraisal was for $164,325. In January 1978, the realtor found a potential buyer, and an earnest money agreement to convey the property was signed. In May 1978, plaintiff seller discovered that the true market value of the property was $400,000 and refused to proceed with the sale. The buyers sued for specific performance on July 26, 1978. Plaintiff seller presented a defense that there was no binding contract because of a failure of a condition precedent set forth in the earnest money agreement, *i.e.,* the failure of the sale to close by a certain date. The trial court granted summary judgment in favor of seller. On buyer's appeal, the Court of Appeals reversed and granted summary judgment in favor of buyer. *Jones v. Jaquith,* 46 Or App 671, 612 P2d 770 (1980). Seller filed an action against the realtor on July 15, 1981, within one year after we denied review but over three years after she discovered defendant's error and was required to defend against the specific performance suit.

We distinguished her case from *Davies:*

"In the present case, when plaintiff was sued for specific performance, she defended by seeking rescission because the sale did not close by the specified date. Unlike the plaintiff in *Davies,* she makes no claim that some aspect of that suit triggered, for the first time, her knowledge of the improper land value or her realtor's possible negligence. To the contrary, it was precisely that knowledge that led her to resist conveying the property at the sale price.

"Plaintiff acknowledges that she became aware of the error in valuation four months after she signed the contract to convey. *At that point, plaintiff was contractually obliged to convey the property at a loss of approximately $235,675, a loss she attributed to defendant's faulty valuation.* Plaintiff nowhere explains why her cause of action did not accrue at that time. She points to the twists and turns of the contract defense she subsequently chose to pursue. However, the outcome of the contract dispute is pertinent only to the possibility that plaintiff's damages might be mitigated by events subsequent to her discovery of harm. Plaintiff's argument that she sustained no harm until the extent of her damage was ascertained, or, in this case, until an appellate decision finally forced her to convey the property, mixes *two discrete concepts, the occurrence of harm and the extent of damages.* We have stated that '[i]t is immaterial that the extent of damages could not be determined at the time of the

[tort]' for purposes of determining when the statute of limitation commenced to run. *Industrial Plating Co. v. North,* 175 Or 351, 354, 153 P2d 835 (1944). Plaintiff's contractual obligation itself constituted harm. The earnest money agreement was an established liability, notwithstanding potential contract defenses. *See Hoffman v. Toft,* 70 Or 488, 142 P 365 (1914). The legal costs plaintiff assumed to resist her contractual duty to convey likewise constituted harm. *U.S. Nat'l Bank v. Davies, supra. See also Niedermeyer v. Dusenbery,* 275 Or 83, 549 P2d 1111 (1976). Her discovery of this harm in May, 1978, commenced the running of the limitation period." (Emphasis added.)

297 Or at 787-88.

In *Davies,* the very question whether the attorneys' advice was correct would be resolved in the litigation with the corporation. If the corporation's suit was resolved in favor of the client, he would be sore put to claim that the advice was incorrect. Only if the litigation precipitated by the stock sale transaction was resolved against the client would it become apparent that the cost of defending the suit was *caused* by the attorneys' advice and not a misapprehension of rights by the corporation.

In *Jaquith,* seller signed the earnest money agreement in January and discovered the true market value of her property in May. There was no doubt as to the cause of her harm once she discovered the fair market value. Nothing in the specific performance suit would negate the possibility of negligence on the part of realtor. If seller had successfully defended against the specific performance suit on her failure of condition precedent argument, realtor would not have been immune from liability for the costs of that defense if caused by his negligent conduct. The fact that seller might have averted the brunt of the otherwise disastrous results of realtor's negligence did not relieve realtor of liability for the reasonable cost of seller's efforts.

In *Jaquith,* as in this case (and unlike *Davies*), no issue related to defendant's alleged negligence would be resolved in the litigation that followed the respective defendant's negligent conduct. The result of the litigation between the present plaintiffs and Ruhle would determine only the amount of plaintiffs' liability to Ruhle. Even if the amount of liability did not exceed the policy limits, plaintiffs would have

had a cause of action against defendant for the expenses of defending against Ruhle if defendant's negligent failure to settle made such a defense necessary.

Plaintiffs' claim for, and recovery of, all damages was predicated, both in their pleading and evidence, on negligence of the defendant occurring prior to April 1978 and on some harm that also occurred prior to April 1978. Only the full extent of harm was left to be determined after that time. Their cause accrued no later than March 31, 1978, and the statute of limitations ran more than two years before action was commenced.

The decision of the Court of Appeals and the judgment of the trial court are reversed, and the cause is remanded to the trial court for entry of judgment in favor of defendant and against plaintiffs.