*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-329

JOSE A. AGUILAR, ET AL., APPELLANTS,

v.

RP MRP WASHINGTON HARBOUR, LLC, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-4698-11)

(Hon. Erik P. Christian, Trial Judge)

(Argued February 18, 2014                    Decided September 4, 2014)

*Gary E. Mason*, with whom *Nicholas A. Migliaccio* and *Jason S. Rathod* were on the brief, for appellants.

*Christopher R. Costabile* for appellees.

Before BLACKBURNE-RIGSBY, *Associate Judge*, and BELSON and STEADMAN, *Senior Judges*.

BLACKBURNE-RIGSBY, *Associate Judge*:  This case raises a matter of first impression:  whether the District of Columbia will follow the majority of jurisdictions by adopting the "economic loss doctrine," which prohibits claims of negligence where a claimant seeks to recover purely economic losses sustained as

a result of an interruption in commerce caused by a third party. We answer that question in the affirmative.

## I.  Factual Background

On June 15, 2011, appellants[1] filed a negligence claim in Superior Court against appellees RP MRP Washington Harbour, LLC and RP MRP Real Estate Services Group, LLC, seeking to recover lost wages that resulted from the closure of their workplaces due to a flood at the Washington Harbour retail complex, which is owned and managed by appellees. Appellants were cooks, servers, bartenders, receptionists, hairstylists, and other employees of various establishments at Washington Harbour, located on the Georgetown Waterfront in Washington, D.C. Washington Harbour is adjacent to the Potomac River and was built in 1986 with unique disappearing flood walls designed to protect the property against floods as high as seventeen feet. RP MRP Washington Harbour, LLC purchased the property in June 2010, and RP MRP Real Estate Services Group, LLC has managed the property since that time. According to appellants, appellees have sole control over the operation of the property's flood walls.

---

[1] Appellant Jose Aguilar and forty-two other persons joined this action as plaintiffs and now jointly appeal the trial court's order granting appellees' motion to dismiss.

On April 18, 2011, the Potomac River surged, and ten to twelve feet of water flooded the ground-level businesses, basement, and parking lot at Washington Harbour. Appellants allege that at the time of the flood, the flood walls were only partially raised or not raised at all, and that it was not until hours after the flood that the flood walls were fully raised. As a result of the flood, appellants' employers were forced to close, most of them temporarily — in some cases days, in other cases for several weeks — and, in at least one case, permanently. These closures left appellants without a source of income for some time. Appellants allege that they suffered lost income in amounts ranging from hundreds of dollars to tens of thousands of dollars.

Their complaint claimed that appellees owed them a duty of care to ensure the safe operation of Washington Harbour, which included raising the flood walls when notified of an impending flood, and that by failing to do so before the April 2011 flood, appellees breached that duty. In support of this claim, appellants allege that the flood walls have been raised sixty or seventy times since Washington Harbour was built in 1986, and that never in Washington Harbour's history has such a failure to raise the flood walls occurred. Appellants also included a statement by District of Columbia Fire and Emergency Services

spokesman Pete Piringer, who said "had the wall[s] been up, [they] would have prevented a flood."

Appellants allege that appellees were alerted to rising water levels by virtue of the Harper's Ferry, West Virginia water gauge, which is where the Potomac River water level is measured. Typically, once the gauge indicates rising waters, appellees would have thirty-two to thirty-six hours to raise the flood walls, which take approximately five hours at a cost of $15,000. In this instance, the National Weather Service issued flood warnings for Washington, D.C., on April 17, 2011. Washington Harbour was flooded the next day, on April 18, 2011. Appellants claim that appellees thus had adequate notice of the impending flood, based on the Harper's Ferry water gauge and the National Weather Service flood warnings. Appellants further allege that appellees knew, or should have known, that the surging Potomac River presented a serious risk of flooding at Washington Harbour, and that the flood walls needed to be raised in order to protect Washington Harbour tenants, and these particular employees, from suffering economic damages.

Appellees filed a motion to dismiss, *see* Super. Ct. Civ. R. 12 (b)(6), arguing, *inter alia*, that appellants failed to state an actionable negligence claim

because the economic loss doctrine bars recovery of claims alleging solely economic loss stemming from a defendant's negligence. Appellants' opposition claimed that the District of Columbia has never applied the economic loss doctrine to preclude non-contractual claims, and, therefore, urged the court to ignore the economic loss doctrine in favor of a foreseeability test to determine whether appellees owed them a duty of care to raise the flood walls to prevent economic injury.

The trial court analyzed the motion to dismiss by looking to case law from other jurisdictions. The trial court found that in cases with analogous facts, the vast majority of jurisdictions applied the economic loss doctrine to bar recovery of lost wages where a claimant suffered no other non-economic injury. The trial court also scrutinized the minority "foreseeability" test adopted in *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 495 A.2d 107 (N.J. 1985) ("*People Express*"), concluding that it was "outweighed" by Maryland precedent, the consistent application of the economic loss doctrine to similar cases in other jurisdictions, and the District of Columbia's general policy favoring limited liability. Although the trial court rejected *People Express*, it observed that the instant claim may be barred even under that test because that case precluded "invitees such as sales and service persons," i.e., appellants in this case, from

bringing negligence claims against third party landlords as any damages that they suffer "would be hopelessly unpredictable and not realistically foreseeable." *Id.* at 116. Accordingly, the trial court dismissed appellants' lawsuit, and this appeal followed.

## II.  Discussion

On appeal, appellants urge us to reverse the trial court's order because this court has previously allowed recovery of purely economic losses in the analogous negligent spoliation context, *see Holmes v. Amerex Rent-A-Car*, 710 A.2d 846 (D.C. 1998), and because application of the economic loss doctrine has been limited to cases involving contract or products liability claims by courts interpreting District of Columbia law. *See Nat'l Tel. Coop. Ass'n v. Exxon Corp.*, 38 F. Supp. 2d 1, 15 (D.D.C. 1998) ("*Exxon Corp.*"). Further, in appellants' view, and quoting *Exxon Corp.*, adoption of the economic loss doctrine "[would] not vindicate any of the interests upon which the doctrine is based," *id.* at 14–15, because appellants and appellees did not have a contractual relationship and never had an opportunity to allocate risk. Instead, appellants argue that the trial court should have analyzed their claim under traditional elements of negligence by looking to whether appellants' lost wages were "reasonably foreseeable" to

appellees. Appellees, on the other hand, urge us to affirm the trial court's order by applying the economic loss doctrine adopted in a majority of jurisdictions, which they claim is consistent with our policy of "limiting the potentially devastating economic effect of extending tort liability to anyone who can claim an adverse economic impact."

This court reviews the trial court's grant of a motion to dismiss *de novo*, and "must construe all facts and inferences in favor of the plaintiff." *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 730 (D.C. 2011). "The only issue on review of a dismissal made pursuant to Rule 12 (b)(6) is the legal sufficiency of the complaint; and a complaint should not be dismissed because a court does not believe that a plaintiff will prevail on his claim." *Grayson v. AT & T Corp.*, 15 A.3d 219, 228–29 (D.C. 2011) (en banc) (citation, internal quotation marks, and brackets omitted).

In order to maintain a legally sufficient negligence claim, a plaintiff must demonstrate: "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (en banc) (citation omitted). "The issue of whether a plaintiff can recover [a particular type

of] damages . . . is a question of policy for the court, not one to be determined on a case-by-case determination of whether the injury was foreseeable." *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 645 n.9 (D.C. 2005) (citation omitted). In other words, "whether the plaintiff's interests are entitled to legal protection against the defendant's conduct," *Hedgepeth*, *supra*, 22 A.3d at 793 (citations omitted), is a question of law for us to decide.

"Generally, under the 'economic loss' rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort." *Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995). This means that in jurisdictions that have adopted the doctrine, claimants are barred from recovering lost profits or lost wages due to the negligent interruption of commerce caused by a third-party.[2] The rationale underlying these cases is a

---

[2] *See, e.g.*, *Aikens v. Debow*, 541 S.E.2d 576, 579-80 (W. Va. 2000) (applying the economic loss doctrine to preclude recovery of lost profits in negligence action following the closure of a bridge); *see also Local Joint Exec. Bd. v. Stern*, 651 P.2d 637, 637-38 (Nev. 1982) (per curiam) (applying the economic loss rule to bar recovery of lost wages in negligence action following a fire at the hotel where plaintiff employees worked); *Stevenson v. E. Ohio Gas Co.*, 73 N.E.2d 200, 203-04 (Ohio Ct. App. 1946) (applying the economic loss rule to bar recovery of lost wages in a negligence action after business was forced to close due to a risk of explosions at a neighboring business). *But see People Express*, *supra*, 495 A.2d at 116 (declining to adopt in New Jersey the economic loss doctrine in favor of a heightened foreseeability standard in case involving solely lost profits); *see also Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 407

(continued . . .)

determination by courts that "[a] line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit," *see Aikens*, *supra* note 2, 541 S.E.2d at 583 (citation omitted), and a recognition that "[l]egal liability does not always extend to all of the foreseeable consequences of an accident," *id.* at 582 (citation omitted). More importantly, as a matter of longstanding policy in courts around the country, "[w]here pure economic loss is at issue[,] not connected with any injury to one's body or property, . . . the reach of legal liability is quite limited." *In re Exxon Valdez*, A89-0095-CV (HRH), 1994 WL 182856, at *8 (D. Alaska Mar. 23, 1994) *aff'd*, 104 F.3d 1196 (9th Cir. 1997); *see also Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927) ("[A] tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." (citation omitted)).

We find compelling the reasoning and policy considerations espoused by the majority of jurisdictions that have adopted the economic loss doctrine and, therefore, adopt the economic loss doctrine in the District of Columbia. In so

---

(. . . continued)
(Fla. 2013) (narrowing applicability of the economic loss rule to products liability claims).

doing, we reject the alternative foreseeability analysis that appellants urge us to apply. Although we have not had occasion to rule on this exact issue previously, our adoption of the economic loss doctrine finds ample support from other jurisdictions, and our rejection of a foreseeability test is firmly rooted in our case law concerning the tort of negligent infliction of emotional distress.

In *Williams v. Baker*, 572 A.2d 1062, 1069 (D.C. 1990) (en banc), we considered the question of whether a plaintiff could recover for negligent infliction of emotional distress caused by witnessing harm to a third person, despite the fact that the plaintiff was not in danger of suffering physical injury. In so doing, we grappled with competing theories of recovery, including a "zone of physical danger" rule, which requires that a plaintiff fear for his or her own safety, and a more permissive foreseeability test — similar to the argument that we are presented with in this case. *Id.* at 1069-70. In adopting the zone of danger rule over a foreseeability test, we balanced the need to hold negligent actors accountable while still maintaining limits on liability. *Id.* at 1072-73. We found "strong public policy considerations against imposing virtually infinite liability" for conduct that is merely negligent. *Id.* at 1069. Further, we examined the experience of other jurisdictions that have adopted a foreseeability test, and concluded that they imposed arbitrary limitations on recovery and eventually

retreated from the concept of foreseeability because it did not provide "a socially and judicially acceptable limit on recovery of damages" for emotional distress. *Id.* at 1072 (quoting *Thing v. La Chusa*, 771 P.2d 814, 830 (Cal. 1989)). Accordingly, we concluded that a foreseeability test would greatly expand the potential for liability without a coherent limiting principle, and decided that "this jurisdiction should not cast itself adrift on a sea of infinite foreseeability, subject only to such arbitrary limitation as we should impose." *Id.*

More recently, in *Hedgepeth*, *supra*, 22 A.3d at 804, we adopted a limited rule to supplement the zone of danger requirement set forth in *Williams* for instances where a party is not in danger of physical injury, but there are compelling policy reasons to permit recovery. That supplementary rule imposed a duty to avoid negligent infliction of serious emotional distress when: (1) the defendant had an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being was necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff, and (2) serious emotional distress was especially likely to be caused by the defendant's negligence. *Id.* at 792. In so doing, we again rejected a foreseeability analysis, however, focusing instead on the likelihood that the negligent conduct in question would cause the particular injury suffered by the plaintiff, thus maintaining strong limits on liability while still

allowing meritorious claims to proceed by examining the special relationship between the parties. *See id.* at 804. It was the special relationship between the claimant and defendant, i.e., the doctor-patient relationship, in that case which provided an independent duty of care, rather than a determination that the claimant's emotional distress was merely foreseeable. *See id* at 813.

For the same reasons we rejected a foreseeability test in cases concerning negligent infliction of emotional distress, we again decline to apply the foreseeability test advocated by appellants in negligence cases involving purely economic losses. Appellants seek support from the minority approach taken in *People Express*, *supra*, 495 A.2d 107, but the *People Express* foreseeability analysis appears to suffer from the same problems we detailed in *Williams* — namely, the lack of a coherent limiting principle. *See* 572 A.2d at 1072. In fact, the *People Express* court seemed to struggle with this very issue, taking pains to place limitations on recovery by stressing that plaintiffs seeking to recover purely economic damages had to satisfy a higher burden than simple foreseeability and show they were "*particularly* foreseeable." 495 A.2d at 116 (emphasis added). This notion of "particular foreseeability" would require an intensive, fact-based inquiry into every case where a claimant suffered purely economic damages, and would go against our repeated declaration that recovery of a particular type of

damages in negligence depends on a legal determination by this court, rather than a case-by-case determination of whether an injury was foreseeable. *See Beretta*, *supra*, 872 A.2d at 645 n.9 (quoting *Williams*, *supra*, 572 A.2d at 1072).

Lastly, appellants contend that application of the economic loss doctrine here would be in conflict with past cases where we have allowed recovery of purely economic losses in negligence-related actions — specifically, *Holmes*, *supra*, 710 A.2d 847, where we recognized the tort of negligent spoliation of evidence, which allows a claimant to seek recovery of economic losses occasioned by the negligent destruction of evidence that a defendant had a duty to preserve. However, in that case, as in *Hedgepeth*, it was the "special relationship" between the parties that created an independent duty of care. *Holmes*, *supra*, 710 A.2d at 849.[3]

---

[3] This special relationship exception conforms with similar exceptions to the economic loss doctrine adopted in other jurisdictions. *See Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996, 1001 (Idaho 2005) (recognizing special relationship exception to the economic loss rule and explaining that it will only apply in "an extremely limited group of cases where the law of negligence extends its protections to a party's economic interest.") (citations omitted); *L & P Converters, Inc. v. Alling & Cory Co.*, 642 A.2d 264, 267 (Md. 1994) ("Where failure to exercise due care only creates a risk of economic loss, an intimate nexus between the parties is generally required. . . . The requirement of an intimate nexus is satisfied by contractual privity or its equivalent." (citations omitted)); *Paul v. Providence Health Sys.-Oregon*, 240 P.3d 1110, 1115, 1117 (Or. Ct. App. 2010) (discussing a special relationship in the context of the economic loss doctrine and

(continued . . .)

We see no basis on which appellants can demonstrate such a special relationship with appellees. Specifically, there was no obligation on the part of appellees to care for appellants' economic well-being. Appellants argue that appellees, as the property owners, have an obligation to provide a safe and secure working environment for everyone on the property, *see* Standardized Civil Jury Instructions for the District of Columbia, No. 10.03 (2010 ed. Rev.), but that obligation does not necessarily implicate appellants' economic expectancies. At oral argument, appellants so much as conceded this point when they stated that the flood walls at Washington Harbour were especially and uniquely designed . . . for the very purpose of preventing injury *to the building*." If preventing property damage was the primary purpose of the flood walls, then any protection of appellants' income was merely an incidental benefit. Moreover, there was no mutually agreed upon relationship between the parties in this case, unlike the doctor-patient relationship in *Hedgepeth* or the contractual agreement in *Holmes*. Rather, it was appellants' employers who had a direct relationship with appellees as commercial tenants at Washington Harbour. It would be an extraordinary step for us to conclude that a commercial landowner is in a special relationship with

---

(. . . continued)

negligent infliction of emotional distress); *Aikens*, *supra* note 2, 541 S.E.2d at 589 ("[A] special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus.").

each of its tenants' employees, despite having no control over their presence on the property.[4]

## III. Conclusion

We hold that the trial court did not err in granting appellees' motion to dismiss because appellants are precluded from pursuing a negligence action against appellees for recovery of lost wages, standing alone absent any other injury, by virtue of the economic loss doctrine. The economic loss doctrine in the District of Columbia bars recovery of purely economic losses in negligence, subject to only one limited exception where a special relationship exists. The facts alleged in appellants' complaint do not fit within this exception. Consequently, appellants have failed to state a claim upon which relief can be granted.

---

[4] Other factors as well dictate against any special relationship. Appellants were not especially likely to suffer serious economic loss as a result of appellees' conduct because too many variables beyond appellees' negligence, such as the duration of the business closure and individual employee circumstances, could prove determinative of the likelihood of serious economic harm. Moreover, appellants have not demonstrated reliance on appellees' use of the flood walls. First, the supposed undertaking was not a result of any agreement between appellees and appellants. Second, there is no indication that appellants were even aware of the flood walls' existence prior to this lawsuit. In fact, in their complaint, appellants only allege that Washington Harbour relied on the flood walls to protect the property and its tenants.

*Affirmed.*