*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-1199

SUZANNE WHITT, APPELLANT,

V.

AMERICAN PROPERTY CONSTRUCTION, P.C., *et al*., APPELLEES.

FILED 4/4/17
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-6365-13)

(Hon. Stuart G. Nash, Trial Judge)

(Argued January 24, 2017                    Decided April 6, 2017)

*Ursula Werner* for appellant.

*Nicholas Andrews*, with whom *Amy Leete Leone* was on the brief, for appellee American Property Construction, P.C.

*Troy A. Priest*, with whom *Jean Marie Sylla, Jr.*, and *Del Wright, Jr.*, were on the brief, for appellee Washington Gas Light Company.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] FISHER, *Associate Judge*, and FERREN, *Senior Judge*.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on March 18, 2017.

FISHER, *Associate Judge*: Suzanne Whitt appeals from Superior Court judgments rejecting her claims for tortious interference with business relations, intentional infliction of emotional distress ("IIED"), and negligence. She argues that the trial judge erred by omitting a proposed jury instruction, by dismissing her negligence claim after applying the "economic loss doctrine," by disqualifying one of her attorneys, and by directing verdicts for appellee Washington Gas Light Company ("Washington Gas") while limiting the scope of her claims against appellee American Property Construction, P.C. ("APC"). We affirm the trial judge's disqualification of appellant's attorney. However, we reverse the trial court's rulings regarding the proposed jury instruction, the economic loss doctrine, one of the directed verdicts for Washington Gas, and the limitation of the factual predicate on which APC's liability was determined. We remand for further proceedings on all claims except IIED.

## I.     Background

From 2011 to 2013, Washington Gas and APC, along with two former defendants in this case—660 Pennsylvania Avenue Associates, LLC ("660 Penn"), and Stanton Development Corporation ("Stanton")—undertook a construction

project next to appellant's hair salon at 323 7th Street, S.E.[1] 660 Penn owned the properties under construction, Stanton was a development company, APC served as general contractor, and Washington Gas allegedly was responsible for excavating the alley, laying a gas line, and re-paving the alley.[2]

On July 1, 2011, 660 Penn obtained a permit that allowed it to close a section of the public alley to perform the construction. The permit specified that 660 Penn "[w]ill not block access via C Street or business entrances of 7th Street alley."

The principal entrance to appellant's salon was in the 7th Street alley. Customers could reach the entrance by walking down the alley to a staircase near the back of a townhouse. That staircase led up to appellant's salon, which was on the second floor. Although there technically was another entrance via the first floor of the building—which would not require one to enter the alley—appellant was not on good terms with the owners of the store on that floor, and one of the

---

[1] Appellant has settled her claims against 660 Penn and Stanton.

[2] Washington Gas has disputed the extent of its role, as we will discuss when analyzing appellant's agency arguments.

owners testified that he was not aware of any lease terms that would require him to allow appellant to use that entrance.

Viewed in a light favorable to her, the evidence showed that appellant encountered many problems during construction. For instance, the activity of workers and the presence of trash, construction equipment, and other miscellaneous items made it difficult to navigate the alley. At times, construction vehicles were parked directly in front of the salon entrance, filling the narrow alley so as to make access difficult, if not impossible. Road signs warning of construction activity were placed at the alley's entrance. During one multi-week stretch, the entire entrance to the alley was blocked off with yellow "caution" tape and red cones, bricks were stacked near the entrance to the alley, and black plastic sheets covered the surface of the alley leading to appellant's salon. Witnesses also testified that a port-a-potty emitting noxious odors and leaking a bluish liquid was placed near appellant's door.

Appellant complained to Stanton, APC, and her city councilmember's office, but the situation did not improve. She alleged that she steadily lost customers due to these problems and incurred approximately $265,000 in losses. She ultimately closed the salon and moved to South Carolina.

Appellant filed suit in the Superior Court against 660 Penn, Stanton, APC, and Washington Gas, alleging tortious interference with business relations, trespass, IIED, and negligence. She later voluntarily dismissed her trespass claim. In preparation for trial, one of appellant's attorneys, Ursula Werner, created a summary of appellant's 2014 income so that appellant's expert could calculate damages. This was necessary because appellant had not yet filed her tax return for 2014. Ms. Werner created the summary from entries in appellant's appointment book, which listed the names of customers on the day they visited the salon. Appellant told Ms. Werner the sums she would have received based on her knowledge of the services each customer requested.

On September 28, 2015, the day trial began, Judge Stuart G. Nash ruled on three of the four major issues in this appeal. First, he declined to include appellant's proposed jury instruction elaborating on the "intent" element of tortious interference with business relations. Appellant had asked for a definition of intent which included conduct that appellees knew was certain or "substantially certain" to interfere with her business. However, Judge Nash concluded that appellant needed to show actual intent, stating that "the idea is that they did this for the purpose of harming Ms. Whitt and her business interests[.]"

Second, Judge Nash disqualified Ms. Werner from serving as appellant's co-counsel. He stated that the defense should have "the ability to explore" how appellant's expert had arrived at his damages figures, and he noted that Ms. Werner had "unconsciously, without any intention of doing so, . . . injected [herself] into the process of [calculating the amount of appellant's 2014 income] by going through the books and using [her] discretion to come up with a key piece of evidence in this case." Judge Nash ruled that the defense could call Ms. Werner as a witness to describe how she had created the summary of income. Because Ms. Werner would be a necessary witness, she could not serve as counsel. *See* D.C. Rules of Prof'l Conduct, R. 3.7 (a). Ms. Werner's co-counsel, Ryan Spiegel, represented appellant at trial.[3]

Finally, Judge Nash ruled that the "economic loss doctrine," as described in *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979 (D.C. 2014), barred appellant's claims for economic damages allegedly caused by appellees'

---

[3] Although appellant challenges the disqualification on appeal, Ms. Werner told Judge Nash that "if the alternative is that you will foreclose the summary that [appellant's expert] relied upon, I'm perfectly willing and able to go on the stand and explain in detail how I came about with [sic] that summary." When Judge Nash cautioned Ms. Werner that such a situation could lead to her disqualification, she stated: "I have able co-counsel. We can discuss that just amongst us."

negligence. Having previously ruled that appellant could not recover damages for the emotional distress allegedly caused by the negligence, Judge Nash dismissed the negligence claim.

During trial, appellant testified and called several witnesses, including her expert, former customers, Stanton's co-president, and Ms. Werner.[4] At the conclusion of appellant's case, both Washington Gas and APC moved for directed verdicts on the remaining claims of IIED and tortious interference with business relations.

Judge Nash directed verdicts for Washington Gas, finding that "[e]ven if . . . acts committed in pursuit of this trenching project were done intentionally to interfere with Ms. Whitt's business or, in the case of the infliction of emotional distress, . . . done recklessly," there was no evidence "from which a reasonable fact finder could determine whether it was Washington Gas that committed those acts . . . or whether it was one of their subcontractors[.]" Judge Nash further noted that appellant had failed to show "that the ties between Washington Gas and the subcontractors were sufficiently strong and that Washington Gas retained sufficient

---

[4] After the court ruled that the defense could call Ms. Werner as a witness, appellant apparently decided to call her before the defense did in order to lay the foundation for the income summary.

direction over the project" so that the subcontractors were agents of Washington Gas. Without proof that Washington Gas or its agents had actually performed the work that led to appellant's grievances, Judge Nash found that no "reasonable juror could impose liability on Washington Gas[.]"

Judge Nash found that appellant had offered evidence that APC was responsible for interference caused by four items: (1) a boom-lift crane, (2) a mini-loader, (3) the port-a-potty, and (4) the road signs. Concluding that a reasonable juror could infer that APC placed these items in such a way as to intentionally inflict emotional distress on appellant or interfere with her business, the court denied APC's motion for directed verdicts. However, Judge Nash refused to "lay blame on APC for all the conditions that existed in the alleyway" because, as with Washington Gas, there was "no testimony as to the relationship between APC and the subcontractors, and whether those subcontractors were independent contractors of APC or agents of APC." Thus, he limited the factual predicate for appellant's claims against APC to the four items for which there was evidence that it was directly responsible. On the verdict form, the jury answered "no" when asked whether it found that APC had committed tortious interference with business relations or IIED.

## II.    Analysis

### A.  The Proposed Jury Instruction on Intent

"[W]e review a trial court's refusal to grant a request for a particular instruction for abuse of discretion, which may be found if the court's charge as a whole does not fairly and accurately state the applicable law." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr.*, 957 A.2d 890, 898 (D.C. 2008).

A prima facie case of tortious interference with business relations requires: "(1) existence of a valid contractual or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by [the defendant]; and (4) resulting damages." *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038 (D.C. 2015) (quoting *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345-46 (D.C. 2015)).

Appellant argues that the trial judge should have given a jury instruction explaining the third element—intent.  She relies upon the Restatement (Second) of Torts, § 766 cmt. j (Am. Law. Inst. 1979), which states that the intent required for tortious interference with business or contractual relations can be proven when the

actor "knows that the interference is certain or substantially certain to occur as a result of his action." That comment refers to, and is reinforced by, Restatement (Second) of Torts § 8A, which clarifies that, as used in the Restatement, the word "intent" refers to both actual intent—in other words, that "the actor desires to cause consequences of his act"—and situations in which the actor "believes that the consequences are substantially certain to result from [his action]."

Appellant asserts that, without further elaboration, the jury would not realize that intent is "broader" than "cases in which the defendant has acted with . . . purpose or desire." *Id.* § 766 cmt. j. She argues that the trial judge should have given her proposed jury instruction explaining that "[i]nterference with someone else's business relationship is intentional if the actor desires to bring the interference about, or if he knows that the interference is certain or substantially certain to occur as a result of his action."

It does not appear that this court has previously faced this question.[5] However, we agree that the trial judge erred by refusing to give the proposed

---

[5] Arguably, we came the closest to confronting this issue in *Kreuzer v. George Wash. Univ.*, 896 A.2d 238 (D.C. 2006). In that case, where the university built a dormitory next to the plaintiff's property, we "summarily" dealt with the plaintiff's claim of intentional interference with prospective economic advantage.

(continued…)

instruction. First, we have repeatedly stated that the "law of tortious interference with business or contractual relationships derives from the Restatement (Second) of Torts." *Newmyer*, 128 A.3d at 1038; *see also Havilah*, 108 A.3d at 345. Both § 766 cmt. j and § 8A of the Restatement make clear that a plaintiff can prove intent by showing that a defendant knew that his actions were certain or substantially certain to interfere with the plaintiff's business. We note that other jurisdictions have adopted the "substantially certain" language.[6]

---

(…continued)
*Id.* at 241-42, 247. In affirming the trial judge's granting of summary judgment to the university, we quoted with approval his observations that "[a]t no point" did the plaintiff "allege that [the university's] primary (or even ancillary) intent . . . was to interfere with [the plaintiff's] economic advantage," and that there was "no allegation that the [university's] construction was *intended* to harm [the plaintiff]." *Id.* at 242, 247-48 (emphasis in original). We also quoted, in passing, a non-binding decision indicating that a plaintiff should make "a strong showing of intent." *Id.* at 248 (quoting *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)). However, there is no indication that the parties in *Kreuzer* or *Sheppard* presented the court with arguments regarding § 766 cmt. j or § 8A of the Restatement, nor did the court mention, much less reject, the "substantially certain" language found in those provisions.

[6] *See, e.g.*, *Ecco Plains, LLC v. United States*, 728 F.3d 1190, 1199 (10th Cir. 2013) (applying Colorado law); *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 212-13 (4th Cir. 2001); *Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 849 (E.D. Va. 2015); *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 649 (D. Md. 2004); *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1137 (S.D.N.Y. 1996); *Total Care Sys., Inc. v. Coons*, 860 F. Supp. 236, 241 (E.D. Pa. 1994); *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 531 (Cal. 1998).

When analyzing the denial of a proposed jury instruction, "we review the record in the light most favorable" to the party that proposed the instruction. *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C. 1997). Although the instruction requested by appellant may not be necessary in every case, it was critical in this one.

Appellant provided evidence, viewed in a light favorable to her, that the construction activity had blatantly harmful effects on her business. At times, APC's boom-lift crane completely blocked the salon's entrance, preventing anyone—including customers—from reaching it. Multiple road signs at the mouth of the alley warned of construction activity and deterred members of the public from entering. A port-a-potty next to appellant's door emitted noxious odors and leaked a bluish liquid, leading to a situation that one of appellant's customers described as "gross." For "[a]t least three weeks," the alley was completely closed off with yellow tape, red cones, and stacked bricks, and the surface of the alley appeared to have been removed and replaced with a black plastic coating that would have deterred customers from entering.[7]

---

[7] We realize that the trial judge did not allow the jury to consider the closing of the alley during these weeks because he granted directed verdicts for Washington Gas and limited APC's liability to the impact of the crane, road signs, port-a-potty, and a mini-loader. However, as we will describe below, the trial

(continued…)

Appellant regularly complained to APC and others about these problems, and there was evidence that those complaints reached Washington Gas. Given the alley's disrepair, the obvious obstacles to reaching appellant's business, and appellees' knowledge of the situation, it was particularly important in this case for the trial judge to instruct the jury that it could find intent if appellees were "certain, or substantially certain" that they were interfering with appellant's business, yet "still [went] ahead" with the construction anyway. Restatement (Second) of Torts § 8A cmt. b.

We emphasize that, even with appellant's proposed jury instruction expanding the concept of intent to include conduct that was certain or substantially certain to interfere with her business, appellees may still claim that they were legally privileged or justified in performing the construction. *See, e.g.*, *NCRIC*, 957 A.2d at 901; *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289-90 (D.C. 1989). Indeed, Judge Nash gave the standard jury instruction explaining this defense.

---

(…continued)
judge erred when granting a directed verdict for Washington Gas on the tortious interference claim and limiting the factual predicate as to APC.

Finally, we hold that the trial judge's error requires reversal. *Cf. Dennis v. Jones*, 928 A.2d 672, 676 (D.C. 2007) (noting that "an error in denying an instruction can be harmless"). As described above, appellant presented substantial evidence that the activities of APC and Washington Gas damaged her business. An instruction clarifying that appellant needed only to show that appellees acted with knowledge that interference would be certain or substantially certain, as opposed to actual purpose or desire to interfere, would have eased appellant's burden of proof on the intent issue.

Indeed, APC highlighted the importance of the intent issue during its closing argument, stating that it was the "big question" and that appellant had provided "no explanation" for "[w]hy in the world" APC "or anyone else" would "do anything to intentionally hurt Ms. Whitt[.]" Given the importance of the issue, we cannot say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Nelson*, 694 A.2d at 902 (internal quotation marks omitted). Accordingly, we reverse so that appellant may receive a new trial on her tortious interference with business relations claim.

## B. The Negligence Claim

Appellant also challenges the dismissal of her negligence claim. The trial judge ruled that this court's decision in *Aguilar* barred appellant's claim for economic damages she attributed to appellees' alleged negligence. We review *de novo* the trial judge's application of the economic loss doctrine. *See Aguilar*, 98 A.3d at 982 (stating that "whether the plaintiff's interests are entitled to legal protection against the defendant's conduct is a question of law for us to decide" (internal quotation marks and citation omitted)); *see also Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 177 (D.C. 2006) ("We review a dismissal for failure to state a claim *de novo*." (internal quotation marks omitted) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 75 (D.C. 2005))).

In *Aguilar,* we adopted the "economic loss doctrine, which prohibits claims of negligence where a claimant seeks to recover purely economic losses sustained as a result of an interruption in commerce caused by a third party." 98 A.3d at 980 (internal quotation marks omitted). In that case, "cooks, servers, bartenders, receptionists, hairstylists, and other employees" of retail establishments in the Washington Harbour complex sought to recover lost wages from the owner and the manager of the property. *Id*. The plaintiffs alleged that the defendants negligently failed to raise flood walls to block a surge of "ten to twelve feet of water" from the Potomac River that damaged the complex's ground-level businesses, basement,

and parking lot. *Id.* at 980-81. The flood forced the plaintiffs' employers to close their businesses temporarily, leaving the employees "without a source of income for some time." *Id.* at 981.

Because the plaintiffs only claimed economic damages, and had not suffered physical injury or damage to their own property, the defendants urged this court to adopt the economic loss doctrine in order to uphold dismissal of the claim. *Id.* at 982, 985. We identified several policy reasons for doing so. We noted that "where pure economic loss is at issue, not connected with any injury to one's body or property, . . . the reach of legal liability is quite limited." *Id.* at 983 (alterations omitted) (citation omitted). We were also concerned about "the lack of a coherent limiting principle" if we adopted the plaintiffs' test of foreseeability and about the wisdom of "imposing virtually infinite liability for conduct that is merely negligent." *Id.* at 983-84 (internal quotation marks omitted).

While recognizing these concerns, we did not signal that economic loss is unimportant. Rather, we were grappling with the question of whether the defendants owed a duty of care to the plaintiffs. *Id.* at 981. We left open the possibility that a plaintiff could recover economic damages if it had a "special relationship" with the defendant. *Id.* at 985-86. We adapted this limiting principle

from *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) (en banc), in which we examined the duty of care that a doctor might owe to her patient in the context of a claim for negligent infliction of emotional distress. *Id.* at 792. In *Hedgepeth* and in *Aguilar*, we recognized that "'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct' is a question of law for us to decide." *Aguilar*, 98 A.3d at 982 (quoting *Hedgepeth*, 22 A.3d at 793).

In *Aguilar*, we did not, of course, suggest that special relationships were limited to interactions such as those between a doctor and a patient. Rather, the nature of the special relationship may depend on the type of damages at issue. This case does not present a situation, as in *Hedgepeth*, where we inquire whether "the defendant ha[d] an obligation to care for the plaintiff's *emotional* well-being or the plaintiff's *emotional* well-being is necessarily implicated by the nature" of the defendant's relationship to the plaintiff, and "serious emotional distress is especially likely to be caused[.]" 22 A.3d at 792 (emphasis added). In *Aguilar*, we instead analyzed whether the defendants had an "obligation . . . to care for [the plaintiffs'] economic well-being" or an "obligation" that "implicate[d] appellants' economic expectancies." 98 A.3d at 985. Holding that the defendants in *Aguilar* did not, we stressed the lack of direct connection between the commercial landlord and the plaintiffs, who were not tenants but rather employees of tenant businesses

located on the property. *Id.* (noting that the landowner had "no control over [the employees'] presence on the property").

Here, however, there was evidence that appellees undertook obligations that would "implicate [appellant's] economic expectancies." *See id.* First, one of the permits that authorized the construction recognized the impact that appellees' actions would have on appellant's business when it required that the construction "not block access" to "business entrances of [the] 7th Street alley." Counsel for APC assured Judge Nash that "[n]o one is going to argue" that APC "didn't know about the public space permits and didn't think [it was] obligated to comply with the terms[.]"

Perhaps most importantly, appellant is not claiming damages caused by an isolated and unexpected occurrence, as in *Aguilar* and the cases cited there. 98 A.3d at 980-81, 983 n.2.[8] She is, rather, seeking damages from two companies

---

[8] *See, e.g.*, *Aikens v. Debow*, 541 S.E.2d 576, 579-80 (W. Va. 2000) (applying the economic loss doctrine when a highway accident caused a bridge to close for less than three weeks); *Local Joint Exec. Bd. v. Stern*, 651 P.2d 637, 637-38 (Nev. 1982) (per curiam) (applying the economic loss doctrine following a fire at a hotel where the plaintiff employees worked); *Stevenson v. E. Ohio Gas Co.*, 73 N.E.2d 200, 201, 203-04 (Ohio Ct. App. 1946) (applying the economic loss doctrine when a fire and subsequent risk of explosions caused a neighboring business to close for eight days).

that participated in extensive construction directly outside of her business entrance over a multi-year period. That construction included the use of several pieces of heavy machinery and the excavation and re-paving of the alley. Appellant frequently communicated with APC and others about this activity for two years, and construction personnel would discuss her complaints with her (though they assertedly failed to improve the situation). It would be especially perverse if APC and Washington Gas could undertake this activity for their own profit while claiming immunity from damages if they negligently caused appellant to lose income. This surely is not the purpose of the economic loss doctrine.

Given this extensive activity over a prolonged period, and the provisions of the permit specifically protecting appellant from the effects of this very conduct, we hold that appellees were in a "special relationship" with appellant for purposes of the economic loss doctrine. *See id.* at 985 (equating a special relationship with an "obligation" that "implicate[s] appellants' economic expectancies"); *Tolu v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008) (per curiam) ("The question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." (alteration omitted) (citation omitted)).

Accordingly, we reverse the trial judge's ruling that appellant cannot, as a matter of law, recover economic damages if she proves injury caused by appellees' negligence.[9]

## C. The Attorney Disqualification

Appellant also challenges the disqualification of Ms. Werner. We review the disqualification of an attorney for abuse of discretion. *Derrickson v. Derrickson*, 541 A.2d 149, 152 (D.C. 1988).

---

[9] However, we affirm the trial judge's ruling that appellant is not entitled to damages for emotional distress allegedly caused by appellees' negligence. Appellant argues that she can recover damages for emotional injury under a negligence theory, although she did not suffer physical injury, because she was in a "zone of physical danger" when walking through an alley in which a welder produced sparks and there were "unstable wooden planks over a foul muddy alley floor." Occasional sparks and the possibility of slipping into mud do not rise to the level of situations in which we have held that a plaintiff could recover damages for emotional distress because she was in a zone of physical danger. *See, e.g.*, *District of Columbia v. Evans*, 644 A.2d 1008, 1019 (D.C. 1994) (holding that a reasonable fact-finder could find a zone of physical danger where a mother was in such close proximity to gunshots that killed her son that a firefighter "pushed [her] to the ground in order to protect her from possible stray bullets"); *Sowell v. Hyatt Corp.*, 623 A.2d 1221, 1222, 1225-26 (D.C. 1993) (holding that a zone of physical danger existed where the plaintiff saw a worm in a spoonful of food that she was about to eat, she had already eaten a significant amount of food from that serving, and she repeatedly vomited after seeing the worm).

Appellant points to two rules of evidence for the proposition that the trial court should have admitted the 2014 income summary without Ms. Werner's testimony. However, the trial judge did not rule that the evidence was inadmissible, but rather that the defense should have the "ability to explore" how appellant had "come up with a key piece of evidence" regarding damages, a "key element in the case[.]" The issue before us, therefore, is whether the trial judge erred in ruling that the defense had a right to call Ms. Werner to explain that evidence.[10]

Ms. Werner was the only person who could have testified meaningfully about the preparation of the summary. She created it using appellant's appointment book and input from appellant. Appellant's expert played no role in this process. Thus, he would not have been able to explain Ms. Werner's methodology. Appellant herself would not likely have been able to explain the summary because Ms. Werner admitted that she used discretion in taking

---

[10] In any event, the rules that appellant cites do not aid her. Fed. R. Evid. 1006 governs summaries of voluminous writings. "[A]s part of the foundation for a [summary], the witness who prepared the [summary] should introduce it." *United States v. Hemphill*, 514 F.3d 1350, 1358 (D.C. Cir. 2008). Here, that would be Ms. Werner. Further, Fed. R. Evid. 703 governs the admissibility of expert opinions when they are based upon facts or data upon which experts would "reasonably rely." Again, the summary of income was admitted, and the expert was permitted to use it when giving his opinion.

appellant's input, along with the entries in the appointment books, and creating an original spreadsheet that purported to summarize hundreds of interactions over the span of eight months.

Given this process and the centrality of the issue, we cannot say that the trial judge abused his discretion in ruling that the defense could call Ms. Werner and that she should be disqualified as a result. *See* D.C. Rules of Prof'l Conduct, R. 3.7 (a) (providing that, with limited exceptions not applicable here, a "lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness"). Of course, at a new trial appellant may seek to prove her 2014 income by different means, and disqualification may no longer be necessary.

### D. Agents or Independent Contractors?

Appellant also argues that the trial judge erred when directing verdicts for Washington Gas and limiting the factual predicate for appellant's claims against APC. Judge Nash found "no evidence" regarding whether Washington Gas or one of its subcontractors had "d[u]g up" the alleyway so as to tortiously interfere with appellant's business or intentionally inflict emotional distress on her. Judge Nash acknowledged that appellant could still prevail if she showed that the

subcontractors were "agents" of Washington Gas rather than "independent contractors." However, he found "simply insufficient evidence in the record for [appellant] to meet her burden of proof on that issue as well[.]" He thus found that no "reasonable juror could impose liability on Washington Gas[.]"

The trial judge used similar reasoning for APC. He found evidence that APC had direct responsibility for four items—the boom-lift crane, the mini-loader, the port-a-potty, and the road signs. However, there was not "a basis upon which to lay blame on APC for all the conditions that existed in the alleyway" because there was "no testimony" as to whether the subcontractors involved in the project were "independent contractors of APC or agents of APC." He therefore limited appellant's case against APC to the four items he had identified.

Both of these rulings were error. "Generally, a company is not liable for the acts of its independent contractors."[11] *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901,

---

[11] An exception to this rule exists when the activity "by its very nature should have been expected seriously to interfere with [plaintiff's] use of her [property]"—in other words, when the contractor's work "amounts to a nuisance." *Taylor v. Tellez*, 610 A.2d 252, 254-55, 255 n.2 (D.C. 1992) (alterations in original) (internal quotation marks omitted) (noting the exception when contractors performed an excavation); *see also Shapiro v. Vautier*, 36 A.2d 349, 350-51 (D.C. 1944) (applying the exception when a contractor damaged the ceiling and floor of

(continued…)

906 (D.C. 2009). However, a company can be liable for the actions of its agents. *See Judah v. Reiner*, 744 A.2d 1037, 1039-40 (D.C. 2000). "The right to control . . . is determinative in establishing the existence" of an agency relationship. *Levy v. Currier*, 587 A.2d 205, 212 (D.C. 1991). Appellant presented evidence that both Washington Gas and APC had the right to control various subcontractors working on the project.

Testimony from a Washington Gas representative and from the co-president of Stanton established that Washington Gas had two subcontractors—Fort Myer and D.A. Foster—that worked on excavating and re-paving the alley. When describing the subcontractors' work, the Washington Gas representative averred that he "manage[s] and [is] responsible for" Fort Myer. He also confirmed that one of his colleagues "manages D.A. Foster." That colleague, who was also a Washington Gas corporate designee, explained that Washington Gas has "construction supervisors" that "periodically, if they deem it necessary, prioritize [the subcontractors'] work[.]" There was further testimony that one of these supervisors visited the site in this case five or six times.

---

(…continued)
another apartment in the building). However, the parties have not briefed the application of this exception, and we therefore decline to rely upon it.

At the very least, this evidence was sufficient for the jury to make a factual determination regarding whether Washington Gas had a right to control Fort Myer and D.A. Foster. The trial judge erred in taking that decision away from the jury and relieving Washington Gas from potential liability.

There also was ample evidence from which a jury could have concluded that APC had a right to control subcontractors at the work site. First, APC was the general contractor. Further, Stanton's co-president stated that Patrick McGivern, an APC employee, served as project manager. Mr. McGivern testified that APC employee David King was "the full-time superintendent" for the project. Appellant confirmed that Mr. King "was the head contractor" and that she saw him "[d]aily" over the course of two years. When appellant complained to workers in the alley, they would inform Mr. King, who would meet with appellant to discuss her complaints.

Mr. King later acknowledged that he was "job superintendent," and he stated that he was "in control of scheduling manpower, getting all the sub[contractor]s out to do what they need to do, things like that." Following this testimony, Mr. McGivern reiterated that APC's role included "mak[ing] sure that [the

subcontractors] did their job[.]"[12] Thus, as with Washington Gas, there was sufficient evidence for the jury to make a determination as to whether APC had the right to control subcontractors at the site. The trial judge accordingly erred when he ruled that there was "no basis for assessing liability against APC for the actions of their subcontractors."

These errors were not harmless. Given the evidence of disruption caused by the excavation and re-paving project, and given our holding that appellant was entitled to her proposed jury instruction regarding intent, we cannot say with "fair assurance" that a jury would not have found that Washington Gas committed tortious interference if it had been allowed to consider whether Washington Gas had an agency relationship with its subcontractors. *See R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 539-40 (D.C. 1991) (establishing that, for harmless error analysis in a civil case, this court must examine whether it can say with "fair assurance" that the verdict was not "substantially swayed" by the error).

---

[12] We recognize that Mr. King and Mr. McGivern made the statements in this paragraph after the judge had already ruled on the agency issues. However, because we are remanding for a future trial, evaluation of the agency issues should focus on all of the available evidence.

The issue is closer regarding APC. Judge Nash allowed the jury to consider four of the major obstacles—the boom-lift crane, the mini-loader, the port-a-potty, and the road signs. Appellant only points to miscellaneous debris and construction equipment as added potential sources of liability. However, we need not decide whether the trial judge's agency ruling regarding APC was harmless error because we must reverse and remand due to our holding regarding appellant's proposed jury instruction. When APC faces a new trial, the jury should be allowed to consider whether there was an agency relationship between APC and its subcontractors which would make APC responsible for items other than the four that the trial judge identified.

### E.  Intentional Infliction of Emotional Distress

Finally, although we remand for further proceedings on appellant's tortious interference and negligence claims, we affirm the judgments for both APC and Washington Gas on appellant's IIED claims. Appellant has not put forth sufficient evidence to meet the high burden of showing "extreme and outrageous" conduct on behalf of appellees. *See, e.g.*, *Newmyer*, 128 A.3d at 1041 (noting that "[t]he requirement of outrageousness [for IIED] is not an easy one to meet" because "the conduct must be so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" (internal quotation marks and citations omitted)).

As the trial judge noted, the two pieces of evidence that arguably best support appellant's IIED claims are the port-a-potty and the boom-lift crane. The port-a-potty was placed next to appellant's entrance despite the fact that it smelled like "raw sewage" and was leaking "blue-colored liquid." Appellant also testified that the port-a-potty was moved "a little closer" to her door after she complained. Further, the crane completely blocked appellant's entrance at times, making travel to the salon difficult, if not impossible.

Nonetheless, the jury apparently was not persuaded that this conduct rose to the high level of extreme and outrageous conduct that is required under our case law.[13] Thus, we will not disturb the jury's verdict rejecting appellant's IIED claim against APC.

---

[13] *See, e.g.*, *Wood v. Neuman*, 979 A.2d 64, 70, 77-78 (D.C. 2009) (refusing to find extreme and outrageous conduct when the defendants had their workmen "jump over [plaintiff's] fence for their convenience," used plaintiff's garden as a "passageway," and caused "destruction" to plaintiff's garden by digging up her plants); *cf. Newmyer*, 128 A.3d at 1027, 1032, 1042-43 (holding that "gratuitous[ly]" publishing a "particularly sexually explicit" complaint via national

(continued…)

Further, the evidence indicated that APC had control over the port-a-potty and the boom-lift crane, and there was no evidence that Washington Gas was responsible for them or for other extreme and outrageous conduct. Accordingly, we affirm the judgment (a directed verdict) for Washington Gas on the IIED count.

## III. Conclusion

We reverse and remand for further proceedings against both Washington Gas and APC on appellant's claims of negligence and tortious interference with business relations. However, we affirm the rulings in favor of Washington Gas and APC on appellant's claims for IIED. We also affirm the trial court's ruling that appellant may not collect damages for emotional distress under a negligence theory. Finally, we affirm the trial court's disqualification of Ms. Werner.

---

(…continued)

media organizations in order to publicly "brand [the victim] with a scarlet letter" and allegedly "disrupt the [victim's] private life and career prospects" could be regarded as extreme and outrageous); *Drejza v. Vaccaro*, 650 A.2d 1308, 1309, 1317 (D.C. 1994) (holding that a reasonable fact-finder could find extreme and outrageous conduct when a police detective "humiliated a distraught rape victim" an hour after her rape by "smirk[ing] at her account, act[ing] as though her ordeal was insignificant and her complaints were unreasonable, bull[ying] her into (initially) not pressing charges," and tossing her underwear at her while telling her to take her "little panties home").

*So ordered.*